UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
DIANE MATOS,

                    Plaintiff,

                                   MEMORANDUM & ORDER
      -against-                   20-CV-04998 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-----------------------------------X
APPEARANCES
For Plaintiff:       Diane Matos, Pro Se
                        1558 9th Street
                        West Babylon, New York 11704

For Defendant:       Frank D. Tankard, Esq.
                        Santana Johanny, Esq.
                        Special Assistant U.S. Attorneys
                        United States Attorney's Office
                        Eastern District of New York
                        c/o Social Security Administration
                        Office of the General Counsel
                        6401 Security Boulevard
                        Baltimore, Maryland 21235

SEYBERT, District Judge:

        Pro se Plaintiff Diane Matos ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability benefits under Title II of the Act by the Commissioner of Social Security (the "Commissioner"). (See Compl, ECF No. 1.) Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (hereafter, the "Motion"), which Plaintiff opposes. (See Motion, ECF No. 13; see

1

<u>also</u> Support Memo, ECF No. 13-1; Opp'n., ECF No. 17.)  For the following reasons, the Commissioner's Motion is GRANTED.

BACKGROUND[1]

I.   Procedural Background

On February 16, 2018, Plaintiff applied for disability insurance benefits alleging disability beginning September 20, 2010, due to: back and neck injury; arthritis; depression; and, hip, leg and shoulder pain.[2]  (R. 194, 205.)  After her application was denied on May 18, 2018, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (R. 10.)  On October 1, 2019, Plaintiff appeared at a disability hearing before ALJ Roxanne Fuller, who presided over the hearing virtually (hereafter, the "Disability Hearing").  (<u>Id.</u>)  Although Plaintiff was informed of her right to representation, she chose to appear and testify without the assistance of an attorney or other representative. (R. 10, 188.)  Cyndee Burnett, a vocation expert ("VE"), testified at the Disability Hearing.  (R. 10.)

---

[1]  The background is derived from the administrative transcript filed by the Commissioner on July 28, 2021. (<u>See</u> ECF No. 10).  For purposes of this Memorandum & Order, familiarity with the administrative record is presumed.  Hereafter, the Administrative Transcript will be denoted by the Court as "R".

[2]  This Order refers to the period from September 20, 2010 (<u>i.e.</u>, the onset of disability) through September 30, 2012 (<u>i.e.</u>, the last date of insurance coverage) as the "Relevant Period".

In a November 13, 2019 decision, the ALJ found Plaintiff was not disabled (hereafter, the "ALJ Decision"). (R. 10-16.) Plaintiff sought review of the ALJ Decision by the Appeals Council (R. 20-21), submitting additional evidence in support of her request. (R. 24-50.) She claimed in her review request to not being able to work because she is depressed, and because she has memory, neck, hand, back, and hip problems. (R. 192.) On August 20, 2020, the Appeals Council denied Plaintiff's review request review, thereby rendering the ALJ Decision the final decision of the Commissioner. (R. 1-3.)

Plaintiff initiated this action on October 19, 2020. (See Compl.) On October 28, 2021, Defendant moved for judgment on the pleadings. Plaintiff filed her Opposition on February 3, 2022. No reply was filed. (See Case Docket, in toto.)

II. Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimony and employment history before turning to her medical records and the testimony of the VE.

A. Testimonial Evidence and Employment History

Plaintiff owned and operated an auto body repair shop with her husband from 1988 until sometime after 1993, when she was involved in an automobile accident (hereafter, the "Accident"). (R. 76, 189-90.) The Accident left Plaintiff with a brain injury and short-term memory loss. (R. 189, 252.) Plaintiff testified

3

she attempted to work after the Accident, but her poor memory affected her ability to work; therefore, she and her husband had to close their business.  (R. 76-77, 190.)  Plaintiff claims she knew she was disabled back in 1993 when she had the Accident, but she "fought her way back" because she "was not going to give in and [ ] didn't."  (R. 80.)

Plaintiff stated that, in 1993, an orthopedic doctor told her she had arthritis of the spine, which her father had and which is hereditary.  (R. 82.)  She claims to have seen many doctors around the time of the Accident, but then "took [her]self off all the doctors," and was "going to get better [her]self." (Id.)

When the ALJ asked Plaintiff whether she saw any doctors between 2010 and 2012, Plaintiff responded, "I don't think so.  I don't remember."  (R. 82.)  Plaintiff further testified: during the Relevant Period she suffered from back, neck and shoulder pain (R. 79-83); she did not undergo tests for her back or neck pain prior to 2012 because she lacked health insurance (R. 80-83); her primary care physician, Dr. Conan Tu ("Dr. Tu"), a Pro Health doctor, prescribed Vicodin for pain; and, some time before 2012, Dr. Tu sent her to a pain doctor for an injection, but there are no records confirming same. (Id.)

Following the Accident, when she was able to return to work, Plaintiff worked for a company in a customer-service

capacity, interacting with its customers at her own pace; the job also gave Plaintiff the freedom to sit, stand, and walk. (R. 190.) Plaintiff held that position from approximately 2001 to sometime in 2004, when the company went out of business. (R. 190-91, 236.)

From approximately 2005 through 2006, Plaintiff began working for her sister-in-law's company, About Design Fire Protection, Inc. ("About Design"), where Plaintiff answered phones, filed, dealt with the mail, and made collection calls. (R. 77-78, 191-92, 206, 236.) While employed by About Design, Plaintiff was able to walk and move around any time she needed; however, she could not sit, stand or lay down for long periods. (R. 77-78.) Plaintiff testified, while About Design went out of business, she had been fired beforehand. (R. 78, 191.) Further, in approximately 2006 or 2007, Plaintiff attempted to work at a friend's restaurant; however, between her "fingers being so bad with arthritis" and her poor memory, she "couldn't do it." (R. 82, 191.)

According to the record, Plaintiff informed her primary care physician that she worked as an Avon sales representative in 2008, 2010, 2011, and 2012. (R. 299, 303, 309, 523.) As of at least July 2017, Plaintiff no longer worked for Avon. (R. 602.) In October 2017, Plaintiff informed her physician that she was working every day as a caretaker for a dementia patient. (R. 442.)

5

Continuing, Plaintiff testified that, about a year prior to the Disability Hearing, she had tried to work for a friend's business, but that attempt was unsuccessful. (R. 79.) Plaintiff explained she could not remember things and she was unable to follow directions. (Id.) Moreover, on her third day of work, Plaintiff got lost going to the job, even though she knew the way. (Id.) When asked why she could not work, Plaintiff responded she "ha[s] no memory left," and due to the shoulder and back pain she suffers; she also stated her age makes it even more difficult now. (R. 79-80.) She claims she has suffered radiating back, neck and shoulder pain since the Accident. (R. 80.)

Plaintiff's earnings statement indicates that she had no earnings between 1995 and 1998, and 2009 and 2019. (R. 201.)

B.     Non-Medical Evidence

At the time of the Disability Hearing, Plaintiff was 62 years old. (R. 15.) Plaintiff attended school through the 12th Grade. (R. 206.) She lives with both her husband and legally blind adult daughter. (R. 251-52.)

In connection with her disability application, on March 17, 2018, Plaintiff completed a function report, which detailed her daily activities and how her condition affected her ability to perform various tasks (hereafter, the "Function Report"). (R. 246-53 (labeled "EXHIBIT NO. 9E").) In the Function Report, Plaintiff indicated: she suffers "bad depression"; cannot handle

6

stress; and, has trouble remembering things.  (R. 246.) She further self-reported having trouble paying attention and being unable to finish tasks starts mostly due to pain.  (R. 247.)  She indicated "everything" she does hurts, i.e., lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, and reaching.  (R. 248.)   Further, as to using her hands, Plaintiff stated her arthritis causes difficulties writing, typing, and opening things. (Id.)   Plaintiff indicated she is able to follow written instructions and sometimes oral instructions.  (R. 246.)  Plaintiff reported she is able to count change, pay bills, handle a savings account.  (R. 249.)   She does not require any special help or reminders to take care of her personal needs and grooming, but she relies upon a pill keeper to remember to take her medications. (R. 250.)  Plaintiff further reported: daily, she prepares simple foods, but cannot stand for long periods in doing so; being able to do light cleaning and laundry; she is able to do yardwork in ten minutes intervals; but, requiring her husband's help with heavy cleaning, such as most of the vacuuming and cleaning the bathtub. (R. 250-51.)   Plaintiff drives.  (R. 251.)   She cares for her legally blind daughter, e.g., driving her to and from work, doing her laundry, and cooking her dinner.  (R. 252.)  Plaintiff reports "wak[ing] up to move all night due to restless leg and pain." (Id.)  Plaintiff's daily activities include: mostly staying home; tidying up; making her husband's lunch and dinner; driving her

daughter to and from work; food shopping when needed; and, watching television.  (R. 253.)  Plaintiff indicated, depending on her pain level, she is able to go outdoors, take a walk, and shop in stores. (R. 251.)  She estimated being able to walk a quarter of a mile before having to stop and rest.  (R. 247.)  She reported: spending time with others on a weekly basis, but mostly via phone; and having no problems getting along with family, friends, neighbors, and persons in positions of authority.  (R. 246, 248.)

In a May 10, 2019 letter, Wendy Darling ("Darling"), Operations Manager at Countertop Design, wrote in support of Plaintiff's disability claim, stating she knew Plaintiff for 25 years, who became physically and mentally disabled due to the Accident. (R. 325).  In her support letter, Darling explained: sometime in late 2017 or early 2018, Plaintiff asked Darling for a job; Darling agreed, offered Plaintiff a conditional position as an administrative assistant, which Darling hoped would become a permanent, full-time position; unfortunately, on her third day of work, Plaintiff got lost coming to the office and when she arrived, appeared visibly disheveled; and, Plaintiff seemed unable to retain or remember information.  (Id.)  Thus, Darling did not hire Plaintiff. (Id.)

C.    Medical Evidence Before Date Last Insured

According to her Disability Report, Plaintiff visited many doctors, including physical therapists and a chiropractor,

for years but "all of [her] older records are gone." (R. 211.) Thus, she identified Dr. Tu, her primary care physician, as a source of medical information regarding her physical and mental conditions. (Id.) Plaintiff was under the care of Dr. Tu from 2005 to 2017. (R. 210.) Plaintiff visited Dr. Tu on: October 13, 2009; October 26, 2009; March 18, 2010; April 22, 2010; and, July 22, 2010. (R. 572-74, 577-80, 586-88, 591-93, 596-98.) The record reflects, at her appointments, Plaintiff presented as a well-appearing, well-nourished woman in no distress, who was oriented to all spheres and had a normal mood and affect. (573, 579, 587, 592, 597.) Examination of Plaintiff's neck, heart, and lungs were normal. (Id.) Similarly, examination of Plaintiff's spine was normal, with no deformity or tenderness and normal range of motion; her extremities were warm without cyanosis, clubbing, or edema. (Id.) Plaintiff was assessed as having: hypertension; insomnia; tobacco abuse; as well as, depression and anxiety for which medication was prescribed. (R. 572-73, 579-80, 587, 592.)

D.    Medical Evidence From the Relevant Period

At a September 17, 2011 visit to her primary care provider for a skin rash, Plaintiff appeared well-nourished and in no distress. (R. 302-03.) She was oriented to all spheres and had a normal mood and affect. (R. 303.) Plaintiff's heart and lung findings were normal. (Id.) Benadryl cream was recommended

for Plaintiff's rash, and Vicodin was refilled for chronic arthritis. (Id.)

On January 16, 2012, Plaintiff visited Pro Health, complaining of a chronic headache and chronic cough, as well as trouble seeing and fatigue. (R. 298-300.) Upon examination, Plaintiff appeared well-nourished and in no distress. (R. 299-300.) Plaintiff's neck, heart, and lungs were all found to be normal; similarly, Plaintiff's spine appeared normal without deformity or tenderness. (Id.) Plaintiff was prescribed Flonase for her chronic headaches, which were found to be consistent with chronic sinusitis. (Id.) A chest X-ray was ordered; the results appeared to be normal. (R. 300, 316, 562.)

Plaintiff's Pro Health records contain no mention of any back or neck pain during the Relevant Period. (See R. 83.) While Plaintiff testified she had one "injection" from a pain doctor during this time, she could not recall the date. (R. 80-83.)

E.    Medical Evidence After Date Last Insured

The bulk of Plaintiff's medical records are from after the Relevant Period, specifically, from 2013 through 2019. (See generally R. 283-561.) Plaintiff continued to receive primary care treatment at Pro Health during that post-Relevant Period time frame. (R. 401-559.) In said records, Plaintiff was repeatedly noted as being a well-appearing, well-nourished woman in no distress. (R. 404, 416, 425, 434, 439, 450, 468, 475, 489, 498,

518, 525, 530, 535, 549, 558.)  Examination of Plaintiff's spine was normal with no deformity or tenderness and with a normal range of motion; her extremities were warm without cyanosis, clubbing, or edema.  (R. 416, 425, 464, 450, 468, 475, 489, 498, 518, 525, 530, 535, 549, 558.)

January 17, 2013 progress notes indicate Plaintiff was assessed as having polyarthralgia-chronic spinal disc herniations. (R. 558.)  November 11, 2014 progress notes from a primary care visit indicate Plaintiff's stress had increased as her mother, who suffered from Alzheimer's disease, had moved in with her. (R. 529.)

Plaintiff was provided referrals for chronic back pain on June 1, 2016, November 16, 2017, and October 15, 2019.  (R. 425, 434, 498.)  On January 26, 2016, Plaintiff appeared for her first visit at Long Island Medical Associates.  (R. 628.)  Notes from that visit record Plaintiff's lumbar stenosis and radiculopathy.  (Id.)  A February 5, 2016 X-ray of Plaintiff's lumbar spine was normal; the X-ray also revealed dense arteriovascular calcification aorta, which was disproportionate to Plaintiff's age.  (R. 660.)  An X-ray of Plaintiff's cervical spine taken that same day showed moderate cervical degeneration at C5-6, as well as straightening of the cervical lordotic curve.  (R. 663.)

In her patient questionnaire completed at a June 1, 2016 primary care visit, Plaintiff noted: having trouble falling or staying asleep or sleeping too much; having a poor appetite; having

little interest or pleasure in doing things; and, feeling down or depressed, but not bad about herself. (R. 501.) Conversely, Plaintiff indicated having no trouble concentrating on things, such as reading a newspaper or watching television. (Id.) However, during the June 2016 visit, Plaintiff complained of increased stress caused by taking care of her demented mother; she screened positive for depression. (R. 495-99.)

On March 27, 2017, after her mother passed away unexpectedly, Plaintiff contacted Pro Health requesting medication; she was prescribed Clonazepam. (R. 459.) Progress notes from a July 11, 2017 examination by Dr. Tu state Plaintiff was grieving the loss of her mother and screened positive for depression. (R. 447-52.) Thus, the Doctor prescribed Plaintiff with an antidepressant. (R. 452.)

On July 17, 2017, Plaintiff completed a health questionnaire during a visit to her primary care doctor. (R. 454.) In the questionnaire, Plaintiff indicated she: had trouble falling or staying asleep; felt tired or had little energy; had little interest in doing things; felt depressed; had a poor appetite; and, had trouble concentrating on things, but never felt bad about herself or had thoughts of self-harm. (Id.)

Dr. Tu's November 1, 2017 progress notes indicate Plaintiff was taking Vicodin for chronic back pain. (R. 439.) Thereafter, on November 30, 2017, Plaintiff began treatment for

back and neck pain at New York Spine and Pain Physicians ("NY Spine and Pain"). (R. 327-32.)   Nonoperative treatment options were recommended for her lumbar and cervical radiculitis. (R. 330-31.) A December 12, 2017 MRI of Plaintiff's lumbar spine showed minimal to mild disc bulging and mild stenosis.   (R. 287-88.) Additionally, the MRI showed that, at the L4-L5, there was a central/left paracentral disc herniation impressing upon the ventral thecal sac and impinging upon the descending L5 nerve roots in the lateral recesses. (R. 288.)  The MRI report further stated, at L5-S1, there was a broad-based central disc herniation impressing upon the ventral epidural fat and impinging upon the descending S1 nerve roots as it emerged from the thecal sac. (<u>Id.</u>)

        Records show Plaintiff did not return to NY Spine and Pain until April 30, 2019, some 16 months after her first appointment at that practice.   (R. 333-37.)   At that time, nonoperative treatments were again recommended to Plaintiff for her lumbar and cervical radiculitis, as well as for her right shoulder pain. (R. 335-36.)  An X-ray was ordered to help assess Plaintiff's shoulder pain, and she was referred to a rheumatologist for evaluation of her joint pain. (R. 336-37.)  A May 7, 2019 MRI of Plaintiff's cervical spine showed: degenerative disc disease at C5-6 resulting in moderate spinal canal stenosis; a herniation at C4-5 compressing the right C5 nerve roots; and, additional milder

degenerative changes. (R. 318-19.) A right shoulder X-ray, performed on May 8, 2019 was normal. (R. 371.)

On May 15, 2019, NY Spine and Pain prescribed Plaintiff a cervical collar, a cervical epidural, and pain medication. (R. 339-40.) A May 17, 2019 MRI of Plaintiff's lumbar spine revealed spinal malalignment with progressive multilevel degenerative disc disease including herniations and stenoses. (R. 321.) Plaintiff received cervical epidural injections on May 29, June 19, and July 10, 2019. (R. 343-44, 346-47, 349-50.) At subsequent visits to Spine and Pain, on July 10 and July 24, 2019, continued epidural injections were recommended to Plaintiff for her cervical radiculitis. (R. 353-54, 357-58.) Similarly, on August 22, 2019, NY Spine and Pain recommended an epidural injection for Plaintiff's lumbar radiculitis, which was administered on September 18, 2019. (361-62, 364-65.)

F.    The VE's Testimony

At Plaintiff's Disability Hearing, the VE was asked to classify Plaintiff's prior work at About Design; she testified the job is titled "Office Clerk" and its exertional level is light. (R. 84.) Next, the VE was asked to consider a hypothetical individual of Plaintiff's age, education, and work experience who could perform a light level of work. (Id.) The ALJ instructed the VE that this individual could occasionally: climb ramps or stairs, ladders, ropes or scaffolds; balance, stoop, crouch, kneel

14

and crawl; be exposed to mechanical parts; operate a motor vehicle; and, be exposed to unprotected heights. (R. 84-85.) The VE responded that such an individual would be able to perform Plaintiff's past work as an office clerk. (Id.)

Then, in response to the ALJ adding the further limitation of the subject hypothetical individual performing routine, repetitive tasks, the VE stated Plaintiff's "[p]ast work would be eliminated." (R. 85.) When asked to further consider that the same individual would be absent from work four times a month, the VE testified that scenario would eliminate all competitive employment, which response was based upon her knowledge of industry standards. (Id.) The VE testified her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except regarding absenteeism tolerance, which was not addressed in the DOT and was "based on [her] knowledge of industry standards through job analysis." (Id.)

## DISCUSSION

### I. Standard of Review

When reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v.

Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence.  Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).  "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

II.  Determination of Disability[3]

　　　　To receive disability benefits, a claimant must be "disabled" within the meaning of the Act.  See 42 U.S.C. § 423(a), (d).  A claimant is disabled under the Act when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled under the Act if she suffers from an impairment which is "of such

---

[3]  Of note:  "[T]he regulations relating to the evaluation of medical evidence were amended for disability claims filed after March 27, 2017."  Jacqueline L. v. Comm'r of Soc. Sec., 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017)).  Because Plaintiff's claim was filed on December 14, 2018, "the new regulations, codified at 20 C.F.R. §§ 404.1520c and 416.920c, apply."  Id.

severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

In Brown v. Commissioner of Social Security, 708 F. Supp. 3d 234 (E.D.N.Y. 2023), Honorable Kiyo A. Matsumoto of this District thoroughly and succinctly articulated the standard the Commissioner must follow in determining a claim of disability, see id. at 241-42, as well as the standard a reviewing district court must utilize when a claimant challenges the Commissioner's determination that the claimant is not disabled, see id. at 242-43. This Court adopts same and incorporates by reference those standards herein.

Generally speaking, in reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)). District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence. See id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).

17

"[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

III. The ALJ Decision

Here, the ALJ applied the five-step disability analysis and concluded Plaintiff was not disabled during the Relevant Period. (R. 12-16; see 20 C.F.R. § 404.1520.)

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged onset date of September 20, 2010, through her date last insured of September 30, 2012. (R. 12.)

At step two, the ALJ determined Plaintiff's arthritis constituted a severe impairment (id.), but also found Plaintiff's depression was not severe as it did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities (R. 13). The ALJ's finding was based upon the "paragraph B" criteria of the disability regulations, 20 C.F.R., Part 404, Subpart P, Appendix 1, which considers the impact of a claimant's mental impairments in four categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) managing herself. (Id.) As to Category

One:  The ALJ considered Plaintiff's abilities for understanding, remembering, or applying information and found Plaintiff had mild limitations based upon her function report where she reported she: does not need special reminders to take care of her personal needs; and, can follow written instructions, pay bills, count change and handle a savings account.  (Id.)  As to Category Two: The ALJ found Plaintiff had no limitation in her ability to interact with others because she stated: not having problems getting along with family, friends, neighbors, or others; and, spending time with others over the phone.  (Id.)  As to Category Three: The ALJ found Plaintiff had a mild limitation in concentrating, persisting, or maintaining pace; this was based upon Plaintiff's testimony she could not follow instructions together with her stating in her function report she is able to: pay bills; count change; handle a savings account; and, follow written instructions.  (Id.)  Additionally, the ALJ observed Plaintiff has a driver's license and drives. (Id.)  As to Category Four:  The ALJ determined Plaintiff suffered no limitation adapting or managing herself, once more observing Plaintiff: does not need special reminders to take care of her personal needs; and, has a driver's license, as well as reiterating Plaintiff helps care for her legally blind daughter.  (Id.)  The ALJ concluded that, because Plaintiff's mental impairment caused no more than "mild" limitation in any of the functional areas, it was non-severe.  (Id.)

At <u>step three</u>, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Social Security regulations.  (R. 14.)  The ALJ considered the criteria of Section 1.04 regarding disorders of the spine and found no medical evidence of record indicated Plaintiff has a compromise of either the nerve root or the spinal cord.[4]  (<u>Id.</u>)  Additionally, the ALJ found no treating or examining physician proffered findings that are equivalent in severity to the criteria of this impairment or any other listed impairment.  (<u>Id.</u>)

At <u>step four</u>, the ALJ determined Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) except: occasional climb ramps or stairs; occasional climb ladders, ropes, or scaffolds; occasional balance, stoop, crouch, kneel, crawl; occasional exposure to moving mechanical parts; occasional operating a motor vehicle; occasional exposure to unprotected heights.

(R. 14); <u>see also</u> 20 C.F.R. 404.1529.  To support her RFC determination, the ALJ "considered all symptoms and the extent to

---

[4]  The Social Security Administration revised the musculoskeletal Listings effective April 2, 2021.  <u>See</u> 85 F.R. 78164, 2020 WL 7649906 (Dec. 3, 2020).  However, the ALJ properly applied the Listings criteria in effect at the time of her decision.

which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 14.)

The ALJ explained she was required to engage in a two-step process when considering a claimant's symptoms: (1) "it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "[s]econd, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, [the ALJ] must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (R. 14.) Further, as to the second prong of the analysis, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (R. 14-15.)

Though Plaintiff alleged disability due to neck pain, back pain, arthritis, and a brain injury, the ALJ found the records prior to Plaintiff's September 30, 2012 date last insured did not

show she was so limited. (R. 15.) The ALJ recognized that an objective medical exam in September 2011 showed Plaintiff was in no distress but was given a prescription refill for Vicodin for arthritis; however, no specific evaluation records concerning arthritis were provided. (Id.) A subsequent objective exam in January 2012 "showed a normal spine without deformity or tenderness and normal range of motion, and [Plaintiff's] extremities were warm without cyanosis, clubbing, or edema on exam." (Id.) The ALJ reported "no additional treatment records related to Plaintiff's neck pain, back pain, arthritis, or brain injury were provided." (Id.)

Moreover, while the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", she concluded Plaintiff's "statements about the intensity, persistence, and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (Id.) The ALJ explained, Plaintiff "testified that she was unable to work due to neck pain, back pain, arthritis, and a brain injury related to a 1993 motor vehicle accident. However, the medical record[s] show she was earning at a substantial gainful activity level for several years after the accident." (Id.) Hence, the ALJ adopted an RFC that limited Plaintiff to light work due to her arthritis with additional non-exertional limitations. (Id.)

Finally, at <u>step five</u>, the ALJ determined that, <u>through the date last insured</u>, (1) Plaintiff was capable of performing past relevant work as an office clerk, and (2) this clerical work did not require the performance of work-related activities precluded by the Plaintiff's RFC. (R. 16.)  Therefore, based upon Plaintiff's RFC, and work experience, the ALJ determined Plaintiff was not disabled.  (<u>Id.</u>)

IV. <u>Analysis</u>

Plaintiff challenges the ALJ's non-disability finding. The Court construes Plaintiff's filings as raising two arguments: (1) the ALJ's decision was not supported by substantial evidence; and (2) the case should be remanded to the Agency for its consideration of new evidence Plaintiff has presented.  However, upon review of the record as a whole, the Court finds: (a) the Commissioner's determination that Plaintiff failed to show she was disabled before the expiration of her insured status on September 30, 2012 is supported by substantial evidence; and (b) Plaintiff's proffered supplemental evidence does not alter that conclusion.

A. <u>The Commissioner's Decision is Supported by Substantial Evidence</u>

Plaintiff asserts she could not work due to neck pain, back pain, arthritis, depression, hip pain, leg pain and shoulder pain. (R. 205.)  However, wholly lacking from the record is any medical evidence to support Plaintiff's disability claim from her

alleged onset date of September 10, 2010 through September 20, 2012, the date her insured status expired. Furthermore, the ALJ's determination that Plaintiff was not disabled is supported by Plaintiff's own evidence, including her testimony.

As to Plaintiff's alleged physical impairments, there is no objective medical evidence from before the date last insured to indicate Plaintiff was impaired during the Relevant Period. Notably, "[a]n ALJ is entitled to rely not only on what the record says but also on what it does not say." Wilson v. Apfel, No. 97-CV-1410, 1998 WL 433809, at *7 (E.D.N.Y. July 30, 1998) (citation omitted); see also Snitzer v. Astrue, No. 09-CV-2705, 2011 WL 1322274 at *9 (E.D.N.Y. Mar. 31, 2011) (citing Peterson v. Gardner, 391 F.2d 208, 209-10 (2d Cir. 1968) (stating the Commissioner "could properly refuse to find a disability in the absence of any objective medical evidence of plaintiff's [condition] at the time of the claimed disability")). The earliest record evidence of medical treatment for Plaintiff's alleged physical impairments is from November 30, 2017, which is more than five years after Plaintiff's date last insured, when Plaintiff began treatment for back and neck pain at NY Spine and Pain. (R. 327-32.) Because the Act required Plaintiff to be insured when her disability first began, in this instance, evidence after September 20, 2012 cannot serve as the basis for a finding of disability. See 20 C.F.R. § 404.131(a) ("[Y]ou must have

disability insured status in the quarter in which you become disabled."); see also Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989) ("[R]egardless of the seriousness of h[er] present disability, unless [Plaintiff] became disabled before, [her date last insured], [s]he cannot be entitled to benefits.") (citations omitted).  Thus, "Plaintiff's failure to seek medical treatment during the period at issue undercuts a finding of disability." Vitale v. Apfel, 49 F. Supp. 2d 137, 144 (E.D.N.Y. 1999).

Here, Plaintiff asserts a lack of health insurance explains her failure to obtain treatment during the Relevant Period.  (See R. 80-83.)  Yet, the record indicates Plaintiff continued to see her primary care provider during that time frame and those records do not indicate anything more than a prescription for pain medication.  (See R. 572-74, 577-80, 586-88, 591-93, 596-98; compare ALJ Decision, R. 15 ("The [Plaintiff] was given a prescription refill for Vicodin for arthritis but no specific evaluation records concerning arthritis were provided." (citation omitted)).)  Further, "while a justified failure to seek or follow through on treatment cannot be used against a claimant, neither can a lack of treatment—justifiable though it may be—serve to bolster an individual's claim." Doria v. Colvin, No. 14-CV-7476, 2015 WL 5567047, at *8 (S.D.N.Y. Sept. 22, 2015) ("The ALJ observed the lack of objective medical evidence to support [plaintiff]'s

claim and moved forward to consider the information actually available. He could do no more." (internal citation omitted)).

In addition to lack of treatment, what medical reports are in the record belie Plaintiff's contention that she could not perform light work during the Relevant Period. Progress notes from Plaintiff's primary care provider from March 19, 2010, April, 22, 2010, and July 22, 2010, evinced: Plaintiff was not in distress; upon exam, Plaintiff's spine was normal, with no deformity or tenderness; and, Plaintiff exhibited a normal range of motion. (R. 573, 579, 587.)

Moreover, the ALJ did not err in declining to base her disability determination upon Plaintiff's testimony alone. The ALJ found "[Plaintiff']s statements about the intensity, persistence, and limiting effects of [] her symptoms [were] not consistent with the record" (R. 15), since the objective medical evidence did not support Plaintiff's allegations. "As a general matter, a claimant's testimony that [s]he was unable to work during the relevant period is not enough alone to prove an entitlement to disability benefits." Snitzer, 2011 WL 1322274, at *9; see also Reynolds v. Colvin, 570 F. App'x 45, 47 (2d Cir. 2014) (summary order) (holding "lack of supporting evidence on a matter where the claimant bears the burden of proof, . . . can constitute substantial evidence supporting the denial of benefits" (citation omitted)). The record reflects Plaintiff was earning at a

substantial gainful activity level for several years after the Accident. (See R. 201.) This, coupled with her daily activity level (as described in her disability reports), undercut the alleged severity of her symptoms; at a minimum, it suggests that, despite her impairments, Plaintiff could engage in some level of work activity. See 20 C.F.R. § 404.1529(c).

As to Plaintiff's alleged depression, the record supports the ALJ's findings that this mental impairment was non-severe. (R. 13-14.) In making this determination, the ALJ properly considered the requisite "four broad areas of mental functioning" by examining Plaintiff's function report and her testimony. (Id.) Based upon the record evidence from the Relevant Period, the ALJ found, because Plaintiff's "medically determinable mental impairment caused no more than 'mild' limitation in any of the functional areas, it was nonsevere." (Id. at 13.) Indeed, "the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" Bourdier v. Saul, No. 19-CV-0205, 2020 WL 705211, at *6 (E.D.N.Y. Feb. 12, 2020) (quoting Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (further quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). Though Plaintiff was assessed as having depression and anxiety prior to and after the Relevant Period, based on the record as a whole, the evidence was

not sufficient to show Plaintiff had a mental impairment which prevented her from performing her past relevant work on or before September 30, 2012.  Accordingly, upon the instant record, the ALJ's conclusion that Plaintiff was not disabled is supported by substantial evidence.

>    B.    <u>Consideration of New Evidence</u>

As discussed below, the additional evidence Plaintiff submitted to the Appeals Council, as well as the supplemental evidence she provided this Court, is unavailing in altering the ALJ's non-disability determination.

>    1.    <u>The Additional Evidence Submitted to the
>          Appeals Council Does Not Warrant Remand.</u>

Upon an administrative appeal where a claimant submits supplemental evidence that had not been before the ALJ, the Appeals Council is required to consider such evidence to the extent it "relates to the period on or before the date of the [ALJ] hearing decision."  20 C.F.R. § 416.1470(a).  If, after considering the additional evidence, the Appeals Council denies review of the ALJ's decision, the record before the reviewing court will then include the supplemental evidence.  See <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996) ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and

determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.").

Here, after the ALJ issued her adverse decision, Plaintiff appealed the ALJ Decision to the Appeals Council; in connection with her appeal, Plaintiff submitted the following new evidence: (1) undated photos of Plaintiff wearing various body braces; (2) an August 17, 2018 list of medications; (3) an undated request for records; (4) a printout explaining epidural and nerve root injections with a handwritten date of September 18, 2019; (5) a 2019 NY Spine and Pain bill for office visits and injections; and (6) a May 10, 2019 single-page letter from a potential employer in support of Plaintiff's disability claim (hereafter, collectively, the "New Evidence").[5]  (See R. 24-31.)  The Appeals Council found the Resubmitted Evidence was duplicates of records before the ALJ and the New Evidence pertained to Plaintiff's condition after the Relevant Period.  (R. 2.)  Thus, finding said Evidence did "not show a reasonable probability that it would change the outcome of the [ALJ D]ecision," it denied Plaintiff's request for review.  (Id.)

Having thoroughly reviewed the record, the Court concurs with the Appeals Counsel; the Resubmitted Evidence is duplicative

[5] Additionally, Plaintiff re-submitted MRI and X-ray reports from February 2016 through May 17, 2019, which were already in the record before the ALJ (hereafter, the "Resubmitted Evidence"). (See R. 2, 32-50.)

of records already before the ALJ, and the New Evidence fails to suggest Plaintiff's ability to function during the Relevant Period was more impaired than determined by the ALJ.  See Adesina v. Astrue, No. 12-CV-3184, 2014 WL 5380938 at *14 (E.D.N.Y. Oct. 24, 2014) ("Additional evidence submitted after an ALJ's determination must be both relevant to the claimant's condition during the time period for which benefits were denied, and present a reasonable possibility that [it] would have influenced the [ALJ] to decide the claimant's application differently." (internal quotation marks omitted; emphasis added)).  As none of Plaintiff's New Evidence relates to the Relevant Period, remand is not warranted.

> 2.   Evidence Attached to Plaintiff's Complaint
>      Does Not Warrant Remand

"When a court is confronted with a case where the plaintiff has submitted supplemental evidence to the court itself to support his or her claim, the court may remand based on that evidence, provided the plaintiff shows good cause for the failure to have incorporated such evidence into the record previously." Campos v. Saul, No. 18-CV-9809, 2020 WL 1285113, at *17 (S.D.N.Y. Mar. 18, 2020) (citing 42 U.S.C. § 405(g)).  Additionally, "[t]o justify remand, the court must find that the supplemental evidence is 'new' -- in the sense that it is not merely duplicative of evidence already in the record, and also that it is 'material' -- that is, relevant to the time period at issue, and probative, such

that it is reasonably possible that such evidence would have influenced the Commissioner to decide the claim differently." Id. (internal citations omitted); see also Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).

Here, Plaintiff attached the following supplemental evidence to her Complaint: (1) an October 17, 1994 disability certificate from an orthopedic doctor stating Plaintiff was totally disabled between March 16, 1993 and October 1, 1994; (2) receipts from 1993 through 1994 for house cleaning, laundry, and shopping services; (3) a March 11, 2020 rheumatology evaluation of Plaintiff referencing "a long history of generalized musculoskeletal pain, wors[e] in her hands," as well as "a known history of cervical and lumbar spine degenerative disease," and stating Plaintiff "is under pain management care with epidural injections"; and (4) June 26, 2020 X-rays of Plaintiff's hands (hereafter, collectively, the "Supplemental Evidence").[6]  (See Compl. at 19-22, 35.)  Further, in opposing the instant Motion, Plaintiff acknowledges that, "when [she] first applied [for disability benefits, she] didn't have any Dr's findings," but claims that she has "now submitted medical testing of [her] injury and spinal cord."  (Opp'n at 2.)

---

[6] Plaintiff also attaches notes from her November 30, 2017, April 30, 2019, and July 24, 2019 visits to NY Spine and Pain, which are already part of the record that was before the ALJ.  (Compl. at 23-26; see R. 327-37, 356-58.)

Plaintiff's Supplemental Evidence is not material or probative because it is either from <u>before</u> the date last insured or from medical testings and evaluations conducted nearly a decade <u>after</u> the alleged onset of Plaintiff's disability. Thus, Plaintiff's proffered Supplemental Evidence fails to offer insight into her specific limitations during the Relevant Period. <u>See Campos</u>, 2020 WL 1285113, at *17; <u>see also Clark v. Saul</u>, 444 F. Supp. 3d 607, 621 (S.D.N.Y. 2020) ("[F]or[] records to provide substantial evidence of a disability <u>during the relevant time period</u>, the records must actually shed light on [the plaintiff's] condition during that period." (emphasis added)). "Evidence of an impairment that reached disabling severity <u>after the expiration of an individuals' insured status</u> cannot be the basis for a disability determination, even [if] the impairment itself may have existed before the individual's insured status expired." <u>Norris v. Barnhart</u>, No. 01-CV-0902, 2002 WL 31778794, at *4 (S.D.N.Y. Dec. 12, 2002) (citing <u>Arnone</u>, 882 F.2d at 38) (emphasis added); <u>see also Vilardi v. Astrue</u>, 447 F. App'x 271, 272 (2d Cir. 2012) (summary order) (stating "reliance on evidence demonstrating a worsening of [a claimant's] condition after [the date last insured] is of little value"); <u>Behling v. Comm'r of Soc. Sec.</u>, 369 F. App'x 292, 294 (2d Cir. 2010) (summary order) (stating claimant's current condition not relevant because she "was required to demonstrate that she was disabled as of the date on which she was last insured"

and "[a]ny new impairments are not relevant" (citations omitted));

Flanigan v. Colvin, 21 F. Supp. 3d 285, 302 (S.D.N.Y. 2014) (denying benefits where "at best the evidence show[ed] that [plaintiff] experienced progressively worsening symptoms that eventually became disabling" after his date last insured).  Hence, since there is no reasonable possibility Plaintiff's Supplemental Evidence from prior to and after the Relevant Period would have influenced the Commissioner to decide Plaintiff's claim differently, remand is not warranted.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the Commissioner's Motion (ECF No. 13) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment in favor of the Commissioner and, thereafter, mark this case CLOSED.  Further, the Clerk of Court is to send a copy of this Memorandum & Order and the Judgment to Plaintiff at her address of record.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    June 17, 2025
          Central Islip, New York